UNITED STATES DISTRICT COURT
<u>NORTHERN DISTRICT OF NEW YORK</u>

SOFIA D.,

       Plaintiff,

  -against-           1:20-CV-1623 (LEK/CFH)

KILOLO KIJAKAZI, Acting
Commissioner, Social Security
Administration,

       Defendant.

_____

<u>**MEMORANDUM-DECISION AND ORDER**</u>

**I.  INTRODUCTION**

   This Social Security appeal is before the Court pursuant to Plaintiff's complaint filed on

December 30, 2020. <u>See</u> Dkt. No. 1 ("Complaint"). Plaintiff seeks review of the determination

made by the Commissioner of Social Security that Plaintiff did not become disabled until

February 19, 2019, and was thus ineligible for disabled widow's benefits until that time. <u>See</u> <u>id.</u>

at 1; <u>see also</u> Dkt. No. 22 ("Plaintiff's Brief") at 3; Dkt. No. 10 ("Record"). At the direction of

the Court, the Commissioner of the Social Security Administration ("Commissioner") filed a

brief prior to the filing of Plaintiff's Brief. <u>See</u> Dkt. Nos. 12, 15 ("Defendant's Brief"). In

addition, the Commissioner was allowed to file a reply to Plaintiff's Brief. <u>See</u> Dkt. Nos. 31, 32

("Defendant's Reply"). For the reasons that follow, the Commissioner's determination is

remanded for further proceedings consistent with this Memorandum-Decision and Order.

**II.  BACKGROUND**

  **A.  Disability Allegations and Plaintiff's Testimony**

Plaintiff is a 57-year-old woman and was 55 years old at the time of her hearing in front of the administrative law judge ("ALJ") on January 29, 2020. See R. at 96, 218. Plaintiff initially alleged a disability onset date in 2008, but during her hearing, sought to change it to 2013. R. at 106–107. Plaintiff has not engaged in substantial gainful employment since 2002. R. at 105. Plaintiff's husband died on October 6, 2017, after a protracted illness. R. at 40. Plaintiff filed her initial application for disabled widow's benefits on November 27, 2017. R. at 17.

*1. Non-Medical Narrative*

As described by Plaintiff, through her own testimony and letters from her therapist and family members, Plaintiff grew up in Mexico and first experienced suicidal thoughts at the age of 13. R. at 37. Plaintiff began attending therapy in 1994, but stopped when she moved to the United States in 1998. R. at 37–38. Plaintiff experienced cultural shock and continued to experience anxiety and depression. R. at 38. In 2002, Plaintiff was diagnosed with depression. Id. The same year, she was laid off from her engineering job and her visa expired, requiring her to return to Mexico.[1] Id. In 2003, Plaintiff returned to the United States with the help of her future husband, and was married in 2005. Id.

In 2006, Plaintiff was diagnosed with fibromyalgia. Id. She considered applying for disability benefits at that time, but instead decided to rely on her husband for financial support. R. at 38, 40.[2] In 2008, Plaintiff was diagnosed with major depression. R. at 40. Plaintiff's depression was exacerbated by the death of her mother on December 24, 2012. Id. Plaintiff and

---

[1] Plaintiff indicates she briefly worked as a computer teacher in 2005. See R. at 277. However, whether Plaintiff's most recent gainful employment ended in 2002 or 2005 is immaterial to Plaintiff's eligibility for benefits.

[2] Note that the pages in the record are incorrectly ordered and page 40 should precede page 39.

her husband attended counseling with Jack D. Ronald at Catholic Counseling Agency, but stopped when they returned Plaintiff's mother's remains to Mexico. Id. In Mexico, Plaintiff was again diagnosed with depression and was prescribed Lyrica, but refused to take it because of concerns about side effects. Id. Plaintiff continued to experience major depression for the next several years. Id. Plaintiff's husband's health began to deteriorate in 2015, and he died in October 2017 in California. Id. Plaintiff's husband's death caused a significant decline in Plaintiff's mental and physical health, both because he was her primarily source of emotional support, R. at 39, 40, and because he played a significant role in the exercise regime she used to treat her fibromyalgia, see R. at 130.

In January 2018, as part of her application for disabled widow's benefits, Plaintiff reported that she sometimes woke up in pain, requiring extra sleep and/or stretching and that she "take it easy." R. at 315. Plaintiff was able to prepare meals for herself and attend mass at her church. R. at 316. She sometimes worked around the house, including undertaking basic household chores, but sometimes became fatigued and required naps. Id. Plaintiff received assistance with cleaning her house and reported that it would take her three days to accomplish what the cleaner could do in three hours. R. at 317. Plaintiff was able to drive up to 40 minutes, and go grocery shopping, but had trouble walking up stairs and walking more than short distances. R. at 316–17. She also experienced pain if she sat or stood for extended periods. R. at 315. Plaintiff experienced frequent infections leading to sinusitis, laryngitis, bronchitis, heart burn, colitis, and urinary infections. R. at 16. Some days, Plaintiff experienced difficulty focusing, and could only work on tasks that required limited concentration and stress. Id. Plaintiff's hypersensitivity caused her stress, anxiety, and headaches and led her to avoid noisy, bright, and crowded places. R. at 316. Because of her symptoms, Plaintiff struggled to

accomplish daily tasks, often feeling overwhelmed and procrastinating even with regard to important duties such as paying bills. Id.

In June 2018, Plaintiff reported that she had been bed-ridden for four weeks in March due to pneumonia symptoms, and beginning in June 2018, had been experiencing headaches, was very emotional and was unable to function. R. at 327. She further reported an inability to complete household chores, that she had begun neglecting taking showers, and had lost interest in any outside activities including the things she previously enjoyed. R. at 331.

In July 2018, Plaintiff was involuntarily hospitalized after a friend and Plaintiff's sister reported concern about self-harm. See R. at 39, 442–43. Plaintiff was released three days later after agreeing to attend therapy. R. at 39. However, the psychiatrist to whom she was referred did not accept her insurance. Id. Plaintiff also received a recommendation to attend therapy with Dr. Carlos Solis. Id. However, when Dr. Solis tried to gather patient information over the phone, Plaintiff became paranoid that her husband's son, who has behaved hostilely toward her, was somehow listening to the conversation and would use it again her. R. at 39–41. This paranoia prevented Plaintiff from obtaining therapy. Since her husband's death, Plaintiff has also become paranoid about medical professionals, and for a time sought treatment only from a homeopathic doctor. R. at 39.

At the end of 2018, Plaintiff returned from California to New York despite concerns of her friends and family. R. at 41, 443, 444. Plaintiff was seen by Social Security Administration doctors in Albany and received a number of references to specialists. R. at 41. In January 2019, Plaintiff reported struggling with depression, anxiety, and panic attacks. R. at 364. She also reported that she was sometimes unable to sleep, was only showering once a week, and was sometimes forgetting to eat on time. R. at 364–65. Plaintiff was sometimes able to cook or to eat

with friends, but other times simply ate fruit, resulting in weight loss. Id. Tasks that previously would have taken an hour could now take weeks. R. at 366. Plaintiff was living with friends because of a mouse infestation and required repairs at her house and needed help with laundry and cleaning. Id. Plaintiff still reported being able to drive and to shop for groceries. R. at 366. She also reported paying her own bills, but often forgetting to pay them on time, resulting in late fees. R. at 367. Plaintiff tried to engage in activities such as praying, reading, listening to music, doing puzzles, enjoying nature, walking, and looking at the sky each day, but reported being so disorganized that she struggled to find the time. Id. Plaintiff also reported significant deterioration of her memory, R. at 370, and pain all over her body, particularly in her joints, R. at 371. The pain could be mild in the morning, but became more severe over the course of the day. Id. When the pain was particularly intense, Plaintiff took pain medication such as ibuprofen. Id. Plaintiff also reported frequent headaches of varying intensity and duration, for which she also sometimes took pain medication. R. at 375. However, Plaintiff avoided taking pain medication to the extent possible because of side effects. Id.

Plaintiff began seeing a therapist in July 2019. Id. She began receiving treatment and medication from a psychiatrist in January 2020. Id.

### 2. Medical Evidence

Despite Plaintiff's alleged long history of depression and other health issues, as described above, the medical evidence in the record is more limited. In September 2013, doctor's notes indicate that following the death of her mother, Plaintiff struggled with apathy and lack of motivation. R. at 480. At that time, Plaintiff was not interested in medications for depression and reported that her faith helped her cope and that she had a lot of support from her husband. R. at 481. At the same time, Plaintiff reported her fibromyalgia but denied joint pain. Id.

In April 2017, doctor's notes indicate that Plaintiff experienced diffuse pains all over her body due to her fibromyalgia and sometimes also abdominal pain, but that changes in diet had proven helpful. R. at 511. In May 2017, Plaintiff was screened for depression and was found to have only "mild depression." R. at 493.

In January 2018, after filing for disabled widow's benefits, Plaintiff's physical impairments were examined by state agency consultative examiner H. Pham M.D., who determined that Plaintiff's physical impairments were non-severe. R. at 136–37. In addition, Plaintiff's file was examined by state agency medical consultant Maurice Prout, PhD, who determined that Plaintiff's mental impairments were non-severe. R. at 137.

In July 2018, doctor's notes indicate that Plaintiff was hospitalized at the Methodist Hospital of Sacramento for suicidal ideation. R. at 557. Plaintiff presented with a "psychiatric problem" and "depressed suicidal thoughts." R. at 560. Plaintiff stated that she was emotional due to her husband's death and that when she had recently visited the cemetery, she had her bag of personal items stolen. Id. Additional notes indicate that Plaintiff made suicidal statements in text messages to her friend, who then contacted Plaintiff's sister. R. at 564. Plaintiff's sister then contacted law enforcement. Id. Plaintiff reported that she had become increasingly depressed since losing her husband and made statements that she wanted to engage in several forms of self-harm. Id. Nonetheless, Plaintiff was focused on leaving the hospital and sought to minimize the circumstances that led to her hospitalization. Id. Plaintiff was assessed to have "major depressive disorder, recurrent, severe," and the doctor ruled out "adjustment disorder with mixed depression and anxiety." R. at 565. The Doctor recommended that Plaintiff be transferred to a psychiatric hospital and "may be started on an antidepressant medication after transfer." Id.

Plaintiff was transferred to Woodland Hospital. R. at 558. There, she declined to start any medications for depression, as she believed her symptoms were due to ongoing grief over her husband's death. R. at 557. Plaintiff acknowledged expressing thoughts of self-harm to her friend during a dispute over text message and expressed that she "just lost it . . . and exploded" and began to think of ways to kill herself. R. at 580. However, Plaintiff stated that she "didn't mean it." Id. Plaintiff was again assessed as having major depressive disorder. R. at 581. However, this time it was labeled as "single episode, unspecified." Over the course of her time at Woodland Hospital, Plaintiff experienced reduced symptoms and was ultimately discharged. R. at 557. Upon discharge, Plaintiff was instructed to follow-up with an outpatient psychiatrist appointment with Dr. Sarkar the following day. R. at 578. There is no indication in the record that this appointment occurred.

Plaintiff received an internal medicine examination on February 19, 2019. R. at 608. Plaintiff was found to be in no acute distress, with a normal gate and mildly limited ability to squat. Id. Plaintiff exhibited largely normal musculoskeletal characteristics, but experienced back, foot, and knee tenderness in her joints. Id. Plaintiff also had "trigger points to neck, shoulders, arms, ribs, back, and legs to 10 with multiple other non-trigger point areas of tenderness." Id. Plaintiff's prognosis was labeled as "fair," and it was recommended that she not carry heavy weights or carry out strenuous activity and be seen by a psychologist. R. at 611.

On the same day, Plaintiff received a psychiatric evaluation from Jennifer Ochoa Pys.D. R. at 614. Plaintiff reported "difficulties falling asleep and lack of appetite . . . depressed mood, occasional crying spells, lack of motivation, hopelessness, loss of usual interests in activities, irritability, diminished self-esteem, concentration difficulties, and diminished sense of pleasure." Id. She stated that depression interfered with her daily tasks and was exacerbated with the loss of

her husband. R. at 614–615. She indicated that she "was traumatized when police involuntarily came into her home and took her to the hospital" and that her husband's son had been verbally abusive to her. Id. She feared that her experiences with both the police and her husband's son would be repeated. Id. Plaintiff further indicated that she was staying with friends because "her house is full of mice, and she is fearful of mice." Id. Finally, Plaintiff reported "palpitations, nausea, sweating, dizziness, breathing difficulties, and trembling, with the last panic attack occurring about a month" prior. Id. These symptoms tended to occur with stressors, and Plaintiff became "confused and overwhelmed by multistep directions and multitasking." Id. While Plaintiff's thought process was found to be coherent, her affect was depressed and she reported feeling "slow, and crying earlier." R. at 616. Plaintiff was able to count and do simple calculations, but her "memory was mildly impaired due to emotional etiologies." Id.

Ochoa ultimately concluded that Plaintiff showed "no evidence of limitation understanding, remembering, or applying simple and complex direction . . . or using reason and judgement to make work-related decisions" and only "mild limitations interacting adequately with supervisors, coworkers, and the public and sustaining concentration and performing a task at a consistent pace." R. at 617. However, Plaintiff was found to have "[m]oderate to marked limitation sustaining an ordinary routine and regular attendance at work and regulating emotions, controlling behavior, and maintaining well-being." Id. "The results of the exam appear to be consistent with psychiatric problems that may significantly interfere with the claimant's ability to function on a daily basis." Id. Plaintiff's diagnosis was described as "major depressive disorder, recurrent, moderate to severe." Id.

On February 27, 2019, a Mental Residual Functional Capacity assessment was carried out by S. Hennessey, PhD. R. at 163–67. Hennessey noted moderate limitations of concentration and

persistence, social interaction, and adaptation. R. at 163–64. Hennessey summarized previous medical evidence and plaintiff's adult function report, concluding that while "data support the presence of a severe psychiatric impairment that results in more than minimal functional limitations," Plaintiff retained capacity to "understand and remember simple, some more detailed, but not highly complex instruction;" "complete simple, some more detailed, but not highly complex tasks, consistently on a sustained basis;" "respond to supervisors and coworkers appropriately and . . . deal[] with the public;" and "adapt to customary changes in an ordinary work environment." R. at 165–66.

On August 26, 2019, once Plaintiff had begun therapy with Katherine Larkin, Larkin completed a medical source statement. R. at 641–49. Larkin listed Plaintiff's diagnosis as "Major Depressive Disorder, recurrent severe without psychotic features," and noted marked or extreme limitations in many areas of daily living; understanding, remembering or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. R. at 644–47. Larkin also noted that during a typical 8-hour workday Plaintiff's symptoms would interfere with the attention and concentration necessary to sustain simple tasks 15% of the day and would require four absences per month. R. at 647, 49.

While additional medical evidence exists in the record for the period following February 19, 2019, it is largely consistent with the evidence provided by Ochoa and Larkin. See generally Record. Because there is no dispute as to Plaintiff's disability status after February 19, 2019, the court declines to summarize this additional evidence.

**B.  The ALJ's Decision**

*1.  ALJ's Analysis of Eligibility*

The ALJ issued her decision on February 18, 2020. R. at 21. She found that Plaintiff is "the unmarried widow of the deceased insured worker and has attained the age of 50" and that she "met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act." R. at 19–20. The ALJ further found that the prescribed period, during which Plaintiff was eligible to apply for benefits ends on October 31, 2024, and that Plaintiff has not engaged in substantial gainful activity since her alleged onset date. R. at 20.

### 2. *ALJ's Analysis of Plaintiff's Testimony and Medical and Opinion Evidence prior to February 19, 2019*

Addressing Plaintiff's testimony, the ALJ found that "claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. at 21.

The ALJ concluded that while Plaintiff alleged that she had been unable to work since July 1, 2008 due to physical and mental impairments, "prior to February 19, 2019, the conclusion that the claimant did not have an impairment or combination of impairments that significantly limited her ability to perform basic work activities is consistent with the objective medical evidence and other evidence." Id. With regard to Plaintiff's physical impairments, the ALJ noted that treatment prior to February 19, 2019 was "intermittent and conservative in nature." Id. The ALJ was persuaded by the opinion of Dr. Pham "because a non-severity finding is consistent with the conservative level of care the claimant received prior to the established onset date." Id. The ALJ also noted that, as of January 2018, Plaintiff "acknowledged the ability to attend to her personal care, prepare simple meals, drive locally, clean her home, shop for light groceries, and do laundry, although she indicated that she required daily naps." Id.

10

With regard to Plaintiff's mental impairments, the ALJ noted that Plaintiff "did not seek counseling or medication management prior to the established onset date." Id. Furthermore, the ALJ was persuaded by the opinion of the state agency medical consultant who reviewed Plaintiff's file in January 2018 and found her mental impairments non-severe because "a non-severity finding is consistent with the claimant's lack of ongoing mental health care." R. at 22. Additionally, the ALJ noted that the medical consultant's opinion was also "supported by the lack of objective findings of cognitive/behavioral deficits." Id. Finally, the ALJ noted that although Plaintiff was hospitalized for three days in July 2018 due to suicidal ideation, "she attributed her symptoms to grief over the recent death of her husband . . . At the time, she declined prescription medication and it does not appear that she pursued outpatient care until 2019." Id.

In assessing the severity of Plaintiff's major depressive disorder, the ALJ also considered the four broad areas of mental functioning known as the "paragraph B" criteria, which include "understanding, remembering, applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself." Id. Because plaintiff "did not seek ongoing treatment for her mental impairments during the period at issue and the record lacks mental status examinations indicative of abnormalities prior to the established onset date," the ALJ found that Plaintiff's "medically determinable mental impairments caused no more than 'mild' limitation in any of the functional areas." Id.

3. *ALJ's Analysis of Medical and Opinion Evidence beginning February 19, 2019*

The ALJ based her findings beginning on February 19, 2019, on the consultative examination performed by Jennifer Ochoa Pys.D in February 2019, as well as August 2019 evidence provided by Plaintiff's therapist Katherine Larkin and a consultative exam from

11

February 27, 2019, by S. Hennessey, PhD. At the consultative examination performed by Ochoa, Plaintiff "exhibited depressed affect with impaired memory." R. at 23. And "[a]lthough Dr. Ochoa concluded that the claimant would be able to perform simple/complex tasks and interact with others with no more than mild restriction, Dr. Ochoa identified moderate-to-marked limitations in the claimant's ability to sustain an ordinary routine, regulate emotions, control behavior, and maintain well-being." Id. Similarly, the ALJ noted, "Katherine Larkin, the claimant's therapist, identified moderate/extreme limitations in the claimant's ability to perform even simple tasks, make work-relate decisions, interact with coworkers/supervisors/public, sustain an ordinary routine, and adapt to changes. According to Ms. Larkin, the claimant would require 15% off task time and four absences per month due to her symptoms." Id. While Hennessey identified only moderate work-related restrictions, the ALJ was ultimately persuaded by the opinions of Dr. Ochoa and Ms. Larkin "to the extent they identify marked work-related mental limitations" because they were "consistent with the overall record subsequent to the established onset date, which reflects ongoing symptoms despite treatment." Id. On the other hand, the ALJ found the opinion of Hennessey unpersuasive because "[t]he overall record is consistent with mental limitations that extend beyond moderate severity given the claimant's record of treatment and the abnormal mental status examinations documented in progress notes." Id.

Based on the opinions of Ochoa and Larkin, as well as other record evidence, the ALJ found that, beginning February 19, 2021, Plaintiff's mental conditions met "the criteria of section 12.04 *Depressive, Bipolar and related disorders* of the listed impairments." R. at 22. As such, the ALJ found Plaintiff eligible for disabled widow's benefits beginning on that date. R. at 24.

### C.  Procedural History

12

Plaintiff filed her initial application for disabled widow's benefits on November 27, 2017. R. at 17. The social security administration denied her claim on January 24, 2018. Id. Thereafter, Plaintiff requested a hearing before an ALJ, which was held January 29, 2020. Id.

On February 19, 2020 the ALJ issued the above-described opinion, finding that Plaintiff became disabled and hence eligible for benefits on February 19, 2019. R. at 17–24. On February 20, 2020, Plaintiff requested review by the Appeals Council, which was denied on October 22, 2020. R. at 1–10. In requesting review by the Appeals Council, Plaintiff submitted new evidence including letters from Plaintiff's therapist, R. at 35–41, Plaintiff's sister, R. 442–43, Plaintiff's father, R. at 444–45, two friends, R. at 446–47, and two priests, R. 448–49, in addition to several medical records, some of which were duplicative of existing evidence in the record, see R. at 42–94.

On December 30, 2020, Plaintiff initiated the present matter. See Compl. Construed liberally, Plaintiff's brief raises four related arguments: (1) the ALJ abused her discretion by not sufficiently considering Plaintiff's hospitalization; (2) Plaintiff's impairments are non-traumatic and did not begin on the day of the consultative exam, as such the ALJ erred in choosing that day as the onset date; (3) the ALJ failed to consider Plaintiff's husband's death as a factor that precipitated and aggravated her symptoms; and (4) the ALJ failed to properly consider that Plaintiff's mental impairments may have prevented her from seeking treatment.[3] See Compl.

## III.    LEGAL STANDARD

### A.  Standard of Review

---

[3] Plaintiff is proceeding pro se and therefore her submissions will be interpreted liberally. Haines v. Kerner, 404 U.S. 519, 520-21 (1972).

When a district court reviews an ALJ's decision denying, in whole or in part, a claim for social security benefits, it must determine whether the ALJ applied the correct legal standards and whether the decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); see also Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). Substantial evidence is "more than a mere scintilla," and must reasonably support the decision maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). Substantial evidence has alternatively been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). This "very deferential standard of review," Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012), requires a court to defer to an ALJ's decision if supported by substantial evidence, "even if [the court] might justifiably have reached a different result upon a de novo review." Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)).

In evaluating an ALJ's decision, the Court must consider the entire record, including evidence was not available to the ALJ. "New evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision." Lesterhuis v. Colvin, 805 F.3d 83, 87 (2d Cir. 2015) (quoting Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996)). "We 'review the entire administrative record, which includes the new evidence, and determine, as in every case, whether there is substantial evidence to support the decision of the Secretary.'" Id. (quoting Perez, 77 F.3d at 46).

**B.  Standard for Award of Disabled Widow's Benefits**

To be eligible for disabled widow's benefits, an individual must show that "(1) she is the widow of a wage earner who died fully insured; (2) she is at least 50, but less than 60 years old; (3) she is disabled; and (4) her disability commenced within seven years of the month in which the wage earner died. Miller v. Comm'r of Soc. Sec. Admin., 988 F. Supp. 2d 347, 357 (E.D.N.Y. 2013) (citing 42 U.S.C. § 402(e)(1), (e)(4)).

A "disability" sufficient to merit an award of benefits under the Social Security Act is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" 42 U.S.C. § 423(d)(1)(A). However, an individual seeking disability benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health and Human Servs., 734 F.2d 930, 935 (2d Cir. 1984).

An ALJ undergoes a five-step evaluation process to determine whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(1). If the ALJ determines at any step that the claimant is disabled or not disabled, the evaluation ends. 20 C.F.R. § 404.1520(a)(4). Otherwise, the ALJ will proceed to the next step. Id.

At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful work activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled. Id. At step two, the ALJ must determine whether the claimant has a medically determinable impairment, or combination of impairments, that is "severe," i.e., that "significantly limits" the claimant's "physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(c). If the claimant does not have such an impairment, the claimant is not disabled. Id. At step three, the ALJ asks whether the claimant's medically determinable

impairment(s) are as severe as an impairment listed in Appendix 1 of Subpart P of § 404. 20

C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R., Pt. 404, Subpt. P, App. 1. If so, the claimant is disabled.

Id. At step four, the ALJ determines claimant's RFC and determines whether claimant can

perform work they performed in the past, if they can, they are not disabled. § 404.1520(a)(4)(iv).

If the claimant cannot perform past relevant work, or if the claimant does not have any relevant

past work, the ALJ decides at step five whether, given the claimant's RFC, age, education, and

work experience, they are capable of adjusting and performing "other work" that exists in

significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant

"cannot make an adjustment to other work," then the claimant is disabled. Id.

In the first four steps, the claimant bears the burden of proof. At step five, the burden

shifts to the Commissioner. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v.

Chater, 77 F.3d 41, 46 (2d Cir. 1996)).

## IV.   DISCUSSION

Here there is no dispute that Plaintiff is the widow of a wage earner who died fully

insured, that she was, at all relevant times, between the ages of 50 and 60, and that her disability

commenced within seven years of the month in which her husband died, as required under 42

U.S.C. § 402(e). See generally Def.'s Br. Furthermore, there is no dispute that as of February 19,

2019, Plaintiff was disabled and eligible for benefits. See Def.'s Br. at 13–14. While Plaintiff

originally alleged an onset date for her disability in 2008 and later sought to modify this date to

2013, R. at 106–107, the thrust of Plaintiff's brief is that the death of her husband in October

2017 exacerbated her conditions, rendering her disabled prior to February 2019.[4] See generally

---

[4] To the extent that Plaintiff challenges the ALJ's determination that she was not disabled
prior to October 2017, the Court finds the ALJ's determination with regard to that time period to
be supported by substantial evidence.

Pl's Br. As such, the Court considers only whether the ALJ erred in not finding Plaintiff disabled beginning at some other point between October 2017 and February 2019.

### A. The ALJ Did Not Abuse Her Discretion in Her Consideration of Plaintiff's Hospitalization

Plaintiff argues that the ALJ abused her discretion "when she did not consider that the Claimant required hospitalization" and when she "diminished the fact of hospitalization." Pl.'s Br. at 11. However, the ALJ did, in fact, consider Plaintiff's hospitalization, writing "[a]lthough she was hospitalized for three days in July 2018 due to suicidal ideation, she attributed her symptoms to grief over the recent death of her husband . . . . At the time, she declined prescription medication and it does not appear that she pursued outpatient care until 2019." A short-term involuntary hospitalization is not necessarily indicative of a long-term inability to engage in gainful activity. See, e.g., Mejias Ortiz v. Colvin, No. 12-CV-14270, 2013 WL 12107609, at *4 (S.D. Fla. Apr. 12, 2013). Here, the ALJ stated sufficient reasons for declining to find Plaintiff's three-day hospitalization to be proof of disability. As such, the Court will not disturb the ALJ's determination.[5]

### B. In Light of New Evidence, the ALJ's Selection of Onset Date is Not Supported by Substantial Evidence

Plaintiff argues that the ALJ erred by finding a disability onset date of February 19, 2019 because the types of conditions Plaintiff experienced "do not start overnight" and "[i]f they existed [o]n the day of the Consultative Examination requested by SSA, they must have existed prior to that date." Pl.'s Br. at 2. While it is undoubtedly true that Plaintiff's conditions did not

---

[5] While the ALJ did not err in her consideration of Plaintiff's hospitalization, on remand the ALJ may reconsider this evidence, including Plaintiff's diagnosis of "major depressive disorder, recurrent, severe," in light of new evidence in the record.

start overnight, Plaintiff bears the burden of demonstrating her disability, see Kohler, 546 F.3d at 265, and the Court merely review's the ALJ's decision to determine whether it is supported by substantial evidence.

The process for determining a claimant's onset date is prescribed in SSR 18-1p, 2018 WL 4945639 (2018).[6] "When a claimant has a non-traumatic or exacerbating and remitting impairment(s), and [the ALJ] determine[s] the evidence of record supports a finding that the claimant met the statutory definition of disability, [she] will determine the first date that the claimant met that definition. The date that the claimant first met the statutory definition of disability must be supported by the medical and other evidence and be consistent with the nature of the impairment(s)." SSR 18-1p. However, "[t]he date [the ALJ] find[s] that the claimant first met the statutory definition of disability may predate the claimant's earliest recorded medical examination or the date of the claimant's earliest medical records." Id. In determining the onset date, the ALJ considers relevant evidence including "the nature of the claimant's impairment; the severity of the signs, symptoms, and laboratory findings; the longitudinal history and treatment course (or lack thereof); the length of the impairment's exacerbations and remissions, if applicable; and any statement by the claimant about new or worsening signs, symptoms, and laboratory findings." Id. The ALJ may also consider "evidence from other non-medical sources such as the claimant's family, friends, or former employers" if she "cannot obtain additional medical evidence . . . and . . . cannot reasonably infer the date that the claimant first met the statutory definition of disability based on the medical evidence in the file." Id.

---

[6] The Court notes that SSR 18-1p rescinded and replaced SSR 83-20 in October 2018. As such, there exists very little caselaw interpreting SSR 18-1p.

Here, with regard to Plaintiff's physical impairments, the ALJ noted that "related treatment prior to February 19, 2019 was intermittent and conservative in nature. The claimant did not require interventions to address related complications, surgery, or hospitalization." R. at 21. The ALJ also relied upon the conclusion of a state consultative examiner, who evaluated Plaintiff in January 2018 and found her physical impairments non-severe. Id. Finally, the ALJ noted Plaintiff's ability to engage in a variety of daily activities. Id. Based on this evidence, the ALJ found Plaintiff's physical impairments did not render her disabled prior to February 19, 2019.

With regard to Plaintiff's mental impairments, the ALJ observed that she "did not seek counseling or medication management prior to" prior to February 2019. Id. As described above, the ALJ further noted that after her hospitalization, Plaintiff "declined prescription medication and it does not appear that she pursued outpatient care until 2019." Id. Finally, as the ALJ describes in her opinion, the "state agency medical consultant who reviewed the claimant's file in January 2018," found Plaintiff's "mental impairments were non-severe." R. at 22. The ALJ was persuaded by this opinion because "a non-severity finding is consistent with the claimant's lack of ongoing mental health care." Id.

The ALJ's finding that Plaintiff was not disabled prior to January 2018 is supported by substantial evidence. With regard to both Plaintiff's physical and mental impairments, the ALJ relied upon the opinions of state agency medical consultants and explained why she found these opinions persuasive. See Baszto v. Astrue, 700 F. Supp. 2d 242, 249 (N.D.N.Y. 2010) ("[A]n ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability.")

In determining that Plaintiff was not disabled between January 2018 and February 2019, the ALJ relied primarily on the "intermittent and conservative" treatment for Plaintiff's physical impairments and Plaintiff's failure to "seek counseling or medication management" for her mental impairments during this time.[7] R. at 21. As noted above, the ALJ is entitled to consider a claimant's lack of treatment, 18-1p, and here, the Court finds no reason to question the ALJ's reasoning with regard to Plaintiff's physical impairments. However, the same cannot be said with regard to Plaintiff's mental impairments. Subsequent to the ALJ's decision, Plaintiff submitted additional evidence to the Appeals Council, which calls into question the assertion that Plaintiff failed to seek mental health treatment. See R. at 39, 41 (noting that Plaintiff was referred to a Psychiatrist who did not accept her insurance; sought therapy with Dr. Carlos Solia, but was prevented from sharing information with him by her paranoia about being overheard by her husband's son; and briefly saw Therapist Bryan Kelso but was unable to continue upon moving from California to New York); see also R. at 446 (also describing Plaintiff's paranoia). Because the ALJ's conclusion that Plaintiff's mental impairments did not result in disability between January 2018 and February 2019 was premised entirely on Plaintiff's failure to seek treatment, and because new evidence casts doubt on that premise, the Court finds that the ALJ's conclusion is not supposed by substantial evidence and must be remanded to allow the ALJ to consider the new evidence submitted to the Appeals Council.[8]

---

[7] The ALJ also found Plaintiff's impairments in the four areas of mental functioning known as "paragraph B" criteria to be mild. R. at 22. However, this finding was justified solely by reference to previous discussion of the claimant's failure to "seek ongoing treatment for her mental impairments." Id.

[8] Under SSR 83-20, on remand the ALJ would have been required to address the ambiguous medical record by calling a medical advisor to testify. See Telfair v. Astrue, No. 04-CV-2122, 2007 WL 1522616, at *7 (S.D.N.Y. May 15, 2007). However, as noted in footnote 2,

**C.  On Remand, the ALJ Must Consider Plaintiff's Husband's Death as a Factor that Precipitated and Aggravated Plaintiff's Symptoms**

In her brief, Plaintiff emphasizes the enormous stress associated with losing a spouse, repeatedly quoting from the book Bereavement: Reactions, Consequences, and Care which states: "The death of a husband or wife is well recognized as an emotionally devastating event, being ranked on life event scales as the most stressful of all possible losses." Committee for the Study of Health Consequences of the Stress of Bereavement, Bereavement: Reactions, Consequences, and Care, 71 (National Academy Press 1984); Pl.'s Br. at 7, 8, 10, 11, 14. Plaintiff argues that the ALJ failed to consider the loss of her husband as a "[f]actors that precipitate[d] and aggravate[d] [her] symptoms" as required under SSR 16-3p, 2017 WL 5180304 (2017).

Defendant responds that the ALJ cannot rely on "claimant-supplied evidence" alone. Def.'s Reply at 2. However, Plaintiff's argument is not that the ALJ failed to rely solely on this factor, it is that she failed to consider it at all. Where, as here, the ALJ has found that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," R. at 21, the ALJ must examine all evidence presented in assessing the credibility of the claimant's statements concerning the intensity, persistence and limiting effects of those symptoms. As Defendant notes, "[i]n considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ] examine[s] the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons;

---

SSR 83-20 has been replaced by SSR 18-1p, which explicitly removes this requirement. SSR 18-1p.

and any other relevant evidence in the individual's case record." Def.'s Reply at 2 (quoting SSR

16-3p.

       Among the factors considered in evaluating the intensity, persistence, and limiting effect

of an individual's symptoms are:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p. In general, the ALJ will consider non-medical evidence to evaluate

> only the factors that are relevant to assessing the intensity, persistence, and limiting effects of the individual's symptoms. If there is no information in the evidence of record regarding one of the factors, [the ALJ] will not discuss that specific factor in the determination or decision because it is not relevant to the case. [The ALJ] will discuss the factors pertinent to the evidence of record.

Id. Few courts have interpreted this language, but this Court finds the reasoning of the court in

Hearn v. Berryhill, No. 16-CV-312, 2017 WL 4070648 (N.D. Ind. Sept. 14, 2017) to be

persuasive. The Hearn plaintiff argued that the ALJ had erred by failing to consider the

plaintiff's daily activities. Id. at 5. The defendant responded by arguing that under SSR 16-3p,

"an ALJ is not required to discuss all of the regulatory factors that she considers, unless she finds

them pertinent to the case." Id. However, the court found this interpretation of the regulation

unpersuasive, noting: "The Ruling does not allow an ALJ to ignore a line of evidence regarding one of the regulatory factors if the ALJ does not find it pertinent. Instead, the Ruling indicates that regulatory factors for which there is no evidence will not be discussed." Id.

The same reasoning holds here. To the extent that Plaintiff has presented evidence that the death of her husband was a factor that precipitated and aggravated her symptoms, the ALJ was required both to consider and to discuss that factor. It is not immediately clear to the Court whether any such evidence was previously presented to the ALJ,[9] however, as such evidence was included in Plaintiff's submission to the Appeals Council and is now part of the record, see R. at 39, 40, 442–49, on remand the ALJ must consider and discuss it.

### D.  On Remand, the ALJ Must Consider that Plaintiff's Mental Impairments May Have Prevented Her from Seeking Treatment

Plaintiff argues that she attempted to seek treatment following her husband's death and particularly after her involuntary hospitalization, but that she was unsuccessful for reasons relating to both her mental health and her financial and insurance situations. See Pl.'s Br. at 11–13. She contends that the ALJ failed to consider these reasons for failing to obtain treatment as required under SSR 16-3p. See id.; see also SSR 16-3p (providing possible considerations including "[a]n individual may not be able to afford treatment and may not have access to free or low-cost medical services" and "[d]ue to various limitations (such as language or mental limitations), an individual may not understand the appropriate treatment for or the need for consistent treatment of his or her impairment."). Defendant responds that the ALJ "properly

---

[9] Because the Court has already found remand to be necessary on other grounds, the Court need not answer this question. See Biro v. Comm'r of Soc. Sec., 335 F. Supp. 3d 464, 472 (W.D.N.Y. 2018) ("However, because the Court has already determined, for the reasons previously discussed, that remand of this matter for further administrative proceedings is necessary, the Court declines to reach this issue.").

'considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p.'" Def.'s Reply at 5 (quoting R. at 20).

In general, an ALJ is "not obligated to explicitly reconcile each piece of evidence he considered in his decision as long as it is clear . . . that he weighed all the evidence of plaintiff's symptoms, both subjective and objective." Ahern v. Astrue, No. 09-CV-5543, 2011 WL 1113534, at *6 (E.D.N.Y. Mar. 24, 2011). Here, because the Court has already found remand necessary on other grounds, it declines to opine on whether the ALJ sufficiently considered Plaintiff's reasons for failing to receive treatment. See Biro v. Comm'r of Soc. Sec., 335 F. Supp. 3d 464, 472 (W.D.N.Y. 2018). However, in light of the new evidence Plaintiff provided to the Appeals Council tending to show that Plaintiff failed to obtain treatment due to paranoia about both medical professionals and the possibility of being overheard by her husband's son, see R. at 39, 41, on remand the ALJ must consider Plaintiff's reasons for failing to obtain treatment.

V.      **CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that the Commissioner's determination of no disability between to October 6, 2017 and February 19, 2019 is **VACATED** and **REMANDED** for further proceedings, consistent with this Memorandum-Decision and Order, to determine the date on which the claimant first met the statutory definition of disability; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      January 31, 2022

Albany, New York

LAWRENCE E. KAHN
United States District Judge